E. T. F. ENTERPRISES, INC., Plaintiff,

v.

NINA RICCI, S. A. R. L., Defendant.

No. 79 Civ. 4489 (LWP).

United States District Court,
S. D. New York.

Sept. 30, 1981.

Allen Jay Bodner, Dianne Mazzanti, Allen Jay Bodner, P. C., New York City, for plaintiff.

Sidney A. Schwartz, Ronald N. Schwartzman, Pollner, Mezan & Stolzberg, P. C., New York City, for defendant.

## OPINION AND ORDER

PIERCE, District Judge.

On March 17, 1975, the plaintiff, E.T.F. Enterprises, Inc. ("ETF"), applied to the United States Patent and Trademark Office for the right to register the trademark "Vittorio Ricci" for shoes, belts, neckties, sweaters, and women's blouses. Defendant, Nina Ricci, S.A.R.L. ("Nina Ricci"), timely filed a notice of opposition to plaintiff's application with the Patent and Trademark Office and an *inter partes* action was commenced before the Trademark Trial and Appeal Board (the "Board"). After discovery, a hearing was held before the Board on November 9, 1978, and on June 28, 1979, the Board rendered its thirteen page decision sustaining the opposition and refusing applicant's registration.

Plaintiff filed the present action, pursuant to 15 U.S.C. § 1071(b), within 60 days following the final decision of the Board; no appeal has been taken to the United States Court of Customs and Patent Appeals. By its complaint, ETF seeks (1) a decree stating that plaintiff is entitled to register the trademark "Vittorio Ricci", and (2) a decree authorizing the Commissioner of Patents to allow registration of plaintiff's trademark for shoes, belts, neckties, sweaters, and women's blouses.

By its answer, defendant Nina Ricci denies the material allegations of ETF's complaint and asserts that the complaint fails to state a claim for relief and that plaintiff's proposed trademark is bound to cause confusion and unfair competition with defendant's "Nina Ricci" trademark. The defendant also asserts four counterclaims against plaintiff, including a claim for trademark infringement pursuant to 15 U.S.C. § 1114(1), a claim for common law unfair competition, a claim for false desig-

nation of origin pursuant to 15 U.S.C. § 1125, and a claim for unfair competition pursuant to N.Y.Gen.Bus. Law § 368–d. With respect to its counterclaims, defendant seeks an order enjoining plaintiff from using the trademark "Vittorio Ricci" or any other trademark encompassing the word "Ricci".

In its reply, plaintiff denies the allegations of defendant's counterclaims and asserts two affirmative defenses, first, that defendant's counterclaims are barred by laches and acquiescence, and second, that defendant has abandoned the use of its registered trademarks in the area of manufacture and sale of men's and women's apparel.[1]

On July 10, 13, 14, 15, and 16, 1981, a bench trial of this action was held. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### Findings of Fact

#### A. ETF

At all times relevant to this action, ETF was and is a corporation duly organized and existing under the laws of the State of New York. Its principal place of business, from which it conducts its retail sales, is located at 1019 Third Avenue, New York, New York. ETF conducts its wholesale business at 1010 Third Avenue, New York, New York.

The principal of ETF is Todd Vittorio Ricci. Todd Ricci, whose name until 1977 was Todd Neil Finkel (*see infra* at 1150–1151), worked in the men's high fashion shoe business with Al di La Shoes in New York City for approximately two years until 1973. In late 1974, Todd Ricci decided to design and sell high fashion men's shoes. Thereafter, he and his father, Edward Finkel, formed ETF.[2]

In late 1974, Edward Finkel and Todd Ricci (then known as Todd Finkel) chose "Vittorio Ricci" as the name under which ETF would market its shoes. Todd Ricci testified that "Vittorio Ricci" was chosen as a fictitious Italian name with a melodious sound that would convey a high class image commensurate with the products ETF intended to market. At that time, Todd Ricci testified that he was aware of the "Nina Ricci" name, but perceived no conflict since he associated "Nina Ricci" with perfume and he believed there were many instances of persons conducting business in the fashion industry under the same surname but different given name.

In March 1975, ETF began selling men's shoes and accessories at its retail store at 1019 Third Avenue. In 1976, ETF began selling shoes on a wholesale basis to small, high fashion boutiques. Later, ETF began selling on a retail and wholesale basis women's shoes designed by Todd Ricci. ETF also sells leather handbags, luggage, and belts designed by Todd Ricci. Presently, all the shoes and boots marketed by ETF are designed by Todd Ricci and manufactured under his guidance in Italy.

Inside each shoe and boot sold by ETF is a label which says "Vittorio Ricci—Handmade in Italy". The sole of the shoes and boots also bears a "Vittorio Ricci" stamp. The shoes are sold in boxes which bear the "Vittorio Ricci" logo. The sign at the retail store at 1019 Third Avenue reads "Vittorio Ricci".

From a fashion point of view, both the men's and women's footwear sold by ETF are considered "fashion forward". As to price, ETF shoes and boots are expensive, ranging from $150 to $400 per pair.

The fashion forward point of view and high price point of view of ETF shoes and boots are reflected in ETF's retail and wholesale customers. According to the tes-

---

1. At the outset of the trial, plaintiff moved to amend its reply so as to assert an additional claim for relief, namely, an order cancelling registration of the defendant's trademarks in the area of manufacture and sale of men's and women's apparel on the grounds of abandon-ment. The Court denied plaintiff's motion. Tr. 463–64.

2. In 1977, Edward Finkel sold his interest in ETF. Glen Finkel, Todd Ricci's brother, is presently Todd Ricci's partner, holding a 25% interest in ETF.

timony of Fred Keller, the women's shoes and accessories merchandise manager of Saks Fifth Avenue department stores (numbering 32 throughout the United States), Vittorio Ricci shoes generally appeal to young career women who are interested in high fashion and are prepared to purchase expensive shoes. Roger Farah, a vice president and merchandise manager of men's fashions at Saks Fifth Avenue department stores, testified that Vittorio Ricci shoes appealed to a customer with high income and sophisticated taste who is looking for something a little different. Doris Johanson Mediros, a vice president and merchandise manager for shoes and fashion accessories at all eleven Bloomingdale's department stores stated that Vittorio Ricci shoes are considered high fashion, high priced, and are located in the designer shoe department. Further, she and Dawn Mello Abraham, an executive vice president and director of fashion merchandising for the Bergdorf Goodman department store in New York City, stated that they regarded the Vittorio Ricci customer as sophisticated with a high income. At the wholesale level, ETF sells Vittorio Ricci shoes and boots to approximately 150 stores in the United States. The wholesale customers include many stores and boutiques which market primarily to high income customers, such as Saks Fifth Avenue, Bloomingdale's, I. Magnin, Neiman-Marcus, Bonwitt Teller, Bergdorf Goodman, and I. Miller.

In 1980, ETF sold $737,000 worth of merchandise at its retail store. Based on figures for the first six months of 1981, ETF projects retail sales of $1.5 million in 1981. In 1980, ETF had sales of $2.4 million on the wholesale level and it projects wholesale sales in 1981 to reach $3.5 to $4 million.

In 1980, ETF spent approximately $25,000 on promoting Vittorio Ricci products. ETF provides magazines and designers with free Vittorio Ricci merchandise. In turn, Vittorio Ricci shoes, boots, and bags receive editorial coverage. During the past several years, Vittorio Ricci footwear has received an extensive amount of editorial coverage in trade publications such as Women's Wear Daily, W., and Footwear News, publications directed towards the fashion oriented public such as Vogue, Harper's Bazaar, Cosmopolitan, and Gentlemen's Quarterly, as well as in general interest publications such as The New York Times, The New York Times Magazine, Daily News Record, People Magazine, New York Magazine, Los Angeles Times, and Daily News. In all cases, the foregoing editorial coverage refers to Vittorio Ricci merchandise as "Vittorio Ricci". Occasionally, after initial references to "Vittorio Ricci", the term "Ricci" alone is used to describe the merchandise. See e. g., PX 14 (Footwear News, 10/1/79, p. 8).

In the future, ETF has immediate plans to continue its footwear, bag, and belt operation and to expand its leather product area by marketing leather coats, leather jackets, and leather ready-to-wear. These products will be marketed under the Vittorio Ricci label.

Before turning to a discussion of Nina Ricci and its business, Todd Ricci's name change warrants brief discussion. As previously discussed, Todd Ricci was named at birth, and known until 1977 as, Todd Neil Finkel. On August 25, 1977, Todd Neil Finkel filed a petition in New York City Civil Court to change his name to Todd Vittorio Ricci. At that time, the opposition proceeding commenced by Nina Ricci against ETF before the Trademark Trial and Appeal Board was pending. By Order dated October 4, 1977, Todd Neil Finkel's name was changed to Todd Vittorio Ricci, effective November 14, 1977. Todd Ricci testified that he changed his name for business and personal reasons.

### B. Nina Ricci

At all times relevant to this action, Nina Ricci was and is a corporation duly organized and existing under the laws of the Republic of France. It is a French couturier house which has been manufacturing and selling high fashion apparel since 1932 and perfume since 1946. Its products are presently marketed on a world-wide basis. Nina Ricci's name was derived from the name of one of the founders of the business, Mme. Nina Ricci. Her son, Robert Ricci, is

currently the president of Nina Ricci. Wladimir de Kousmine, the executive vice president of Nina Ricci testified that Nina Ricci has "two faces": perfume and apparel. Tr. 57. To date, the vast majority of Nina Ricci's business conducted in the United States has been in the perfume market.

In the United States, Nina Ricci holds several registered trademarks, including "Nina Ricci", "Mademoiselle Ricci", "Capricci", and "Signoricci", which cover perfume and related products, women's and men's apparel and accessories, and eyeglasses.[3]

In 1947, Nina Ricci began selling perfume in the United States and in 1949 Jacqueline Cochran, Inc. was given the sole right to distribute Nina Ricci perfumes and fragrances in the United States. Freda Robinson, the executive vice president of Jacqueline Cochran, Inc., testified that Nina Ricci perfume, lotion, dusting powder, body cream, toilet water, and bath oil is sold in approximately 3600 stores and boutiques throughout the country, including Saks Fifth Avenue, Bonwit Teller, Bergdorf Goodman, Bloomingdale's, Macy's, B. Altmans, Bullochs, I. Magnin, Marshall Field, and others. "L'Air du Temps" perfume and other "L'Air du Temps" products (bath oil, powder, etc.) are the most popular Nina Ricci products. In 1980, products sold under the "L'Air du Temps" name accounted for approximately $32 million of Jacqueline Cochran's $34.6 million net wholesale sales of Nina Ricci products in the United States. L'Air du Temps perfume and related products are packaged in containers and boxes which bear the "Nina Ricci" mark. Often the words "Nina Ricci" are followed by the word "Paris" or "Paris-New York".

Concerning other perfume products, Robinson testified that Jacqueline Cochran, Inc. distributed "Capricci" fragrances and "Farouche" fragrances on behalf of Nina Ricci in the United States. In 1980, the net wholesale sales of those two fragrances was $1.2 million for Farouche and less than $1 million for Capricci. Robinson further testified that "Signoricci" fragrances had not been sold in the United States since 1974. However, another line of men's fragrances was introduced in the United States in September 1980 under the label "Ricci for Men". All of the foregoing products bear the mark "Nina Ricci" on the container or wrapper.

During the period 1970 to 1980, Nina Ricci spent approximately $11.7 million on national television and print media advertising for its fragrances in the United States. During the same period, Nina Ricci spent an additional $18 million in promotional efforts, including cooperative advertising and use of bill inserts (i. e. leaflets inserted in monthly bill sent out by department stores). For 1981, Nina Ricci has budgeted over $2.5 million for national media advertising and $3.6 million for sales promotion. Nina Ricci's entire national advertising budget for 1980 was used to promote "L'Air du Temps" products.

As a promotional device, Nina Ricci has utilized a "purchase with purchase" technique, whereby a customer who buys a Nina Ricci perfume product may then purchase, at a reduced price, a cosmetic bag, umbrella, tote bag, or lucite caddy shaped like a dove. The items sold with the perfume all

**3.** Nina Ricci is the holder of the following registered trademarks: "Nina Ricci", covering perfume (No. 563,573, dated 9/2/52, renewed 9/2/72); "Nina Ricci", covering women's hosiery, lingerie, brassieres, girdles, shoes, hats, scarves, and ties (No. 721,059, dated 9/5/61); "Nina Ricci", covering the same goods as No. 721,059 (No. 923,259, dated 11/2/71); "Nina Ricci", covering perfume, cologne, toilet water, dusting powder, hairspray, and bath oil (No. 947,699, dated 11/21/72); "Nina Ricci", covering eyeglasses, sunglasses, diamonds and jewelry of precious metals (including necklaces, bracelets, earrings, and watches), valises, record cases for keeping files and written records, suitcases, handbags, portfolios, umbrellas, wash cloths and wash gloves, women's hosiery, bathrobes, lingerie, brassieres, girdles, shoes, hats, scarves, and ties (No. 1,123,345, dated 10/30/79); "Mademoiselle Ricci", covering women's hats, coats, hosiery, lingerie, brassieres, girdles, scarves, and ties (No. 782,889, dated 1/5/65); "Capricci", covering perfume and toilet water (No. 793,777, dated 8/3/65); "Signoricci", covering perfume and toilet water (No. 813,150, dated 8/16/66); and "Signoricci", covering ties, neckwear, and handkerchiefs (No. 835,987, dated 9/26/67).

bear the "Nina Ricci" mark and cannot be purchased alone in the United States.

Robinson testified that the customer who purchases Nina Ricci fragrances is a sophisticated buyer, is in an upper income bracket, and has a definite taste in fragrances.

With regard to products other than fragrances, beginning as early as 1961, Nina Ricci entered into licensing agreements with American companies pursuant to which "Nina Ricci" clothing and accessories were sold in the United States. These license agreements (DX I) covered women's clothing, women's ready-to-wear, furs, women's gloves, women's sleepwear, brassieres, girdles, jewelry and costume jewelry, millinery, men's neckties, ascots, mufflers, scarves, and handkerchiefs, and eyeglasses and sunglasses. These various products were sold under the "Nina Ricci", "Mademoiselle Ricci", and "Signoricci" marks. While apparel and accessories bearing the mark "Nina Ricci" have continuously, although sporadically, been sold in the United States, no products bearing the mark "Mademoiselle Ricci" have been sold in the past two years in the United States.

In September 1980, Nina Ricci opened a boutique at Bloomingdale's which carries Nina Ricci ready to wear, handbags, jewelry, scarves, and lingerie.[4] Under an agreement between Nina Ricci and Bloomingdale's, the latter is committed to purchase in the first year approximately $1 million of dresses, while Nina Ricci is committed to contribute over $175,000 to promotion and advertisement of the Nina Ricci boutique. In the past year, Nina Ricci apparel and fragrances have been promoted at fashion shows and parties sponsored entirely by Nina Ricci.

Nina Ricci has never sold, nor does it plan to sell in the future, footwear in the United States.

From the evidence presented, precise United States sales figures for Nina Ricci apparel and accessories during the past few years cannot be ascertained. In general terms, Nina Ricci's sales of products other than fragrances has been a small percentage of its overall United States sales during the past several years.

As to its future plans in the United States, Nina Ricci has recently executed a franchise agreement, under which a Nina Ricci store is scheduled to open on Rodeo Drive in Beverly Hills, California, in late 1981 or early 1982. A full complement of Nina Ricci products (including apparel, accessories, and fragrances) bearing the "Nina Ricci" mark will be offered at that store. de Kousmine testified that Nina Ricci plans to open more franchised shops in the United States and increase its licensing operations in order to expand into other product markets in the United States.

C. *Stefano Ricci and Luciano Ricci*

Stefano Ricci, an Italian manufacturer, sells neckties, men's belts, bathrobes, and shirts in the United States. Its United States agent, Vincenzo Brandonisio, testified that Stefano Ricci products, primarily neckties, are sold in New York, Florida, and San Francisco; that Stefano Ricci has sold in the United States for five or six years; that its products bear a "Stefano Ricci" label; and that its sales in 1980 were approximately $1 million. Stefano Ricci ties and silk robes are offered for sale at Saks Fifth Avenue in New York City.

Luciano Ricci, also an Italian manufacturer, sells leather belts and attache cases in the United States and has done so for the past 20 years. Its products bear the "Luciano Ricci" label.

D. *Proceedings and Decision Below*

The procedural history of the opposition proceeding before the Board is set forth, *supra*, at 1–2. Notably, the record before

---

4. With regard to leather belts, men's wallets, and women's purses, de Kousmine was not sure whether those items were sold at the Bloomingdale's boutique or in any other store in the United States (Tr. 102, 109). Absent more compelling evidence, the Court finds that those items are not presently available in the United States. However, the Court accepts de Kousmine's statement, confirmed by DX J, that Nina Ricci plans to offer those items for sale at its forthcoming Beverly Hills store.

the Board consisted of (1) the pleadings; (2) on behalf of Nina Ricci, three depositions of persons affiliated or previously affiliated with Jacqueline Cochran, Inc., the deposition of Robert Ricci, and several exhibits; (3) on behalf of ETF, the deposition of Todd Ricci and various exhibits; and (4) briefs submitted by both parties. At the hearing held before the Board on November 9, 1978, the parties submitted the depositions and exhibits, and made oral argument; no live testimony was presented to the Board.

After making findings of fact, the Board framed the issue to be considered as "whether the contemporaneous marketing of the respective products of the parties under the marks here involved is likely to cause confusion or to cause mistake or to deceive." *Board Decision* at 7 (part of Court's Exhibit 1). In making its determination, the Board first ruled that "the goods of both parties comprise closely related if not identical goods, and are so commercially related that confusion in trade would be likely to result if they were sold under the same or confusingly similar marks." *Id.* at 8. The Board then found the two marks to be confusingly similar. Accordingly, Nina Ricci's opposition was sustained and the Board refused to allow registration of the "Vittorio Ricci" mark for shoes, sweaters, belts, neckties, and women's blouses.

## Conclusions of Law

### A. ETF's Claim

■ As previously discussed, rather than appealing the Board's decision to the Court of Custom and Patent Appeals, ETF elected to file a civil action in federal district court pursuant to 15 U.S.C. § 1071(b). This civil action is a trial *de novo*; however, the Court must accept the Board's decision "as controlling on issues of fact unless the contrary is established by testimony which in character and amount carries thorough conviction." *Wilson Jones Co. v. Gilbert & Bennett Mfg. Co.*, 332 F.2d 216, 218 (2d Cir. 1964). *Accord Sarah Coventry, Inc. v. T. Sardelli & Sons, Inc.*, 392 F.Supp. 347, 351–54 (D.R.I.1974), *aff'd*, 526 F.2d 20 (1st Cir. 1975), *cert. denied*, 426 U.S. 920, 96 S.Ct. 2626, 49 L.Ed.2d 374 (1976); *Conard-Pyle Co. v. Thuron Industries, Inc.*, 201 U.S.P.Q. 733, 736 (N.D.Tex.1978); *Dow Corning Corp. v. Applied Power Industries, Inc.*, 322 F.Supp. 943, 944 (N.D.Ill.1970); *Anglo Fabrics Co. v. Fabriken Anglomac A/S*, 282 F.Supp. 454, 457 (D.D.C.1968).[5] Both parties to the civil action are permitted to introduce additional evidence to the district court. *Wilson Jones Co.*, 332 F.2d at 218. Contrary to defendant's contentions, the district court is not barred from receiving evidence regarding events which post-date the Board's hearing. As stated by the Second Circuit, "the [district] court cannot freeze the record on the proceedings before the Board." *Id.*

■ The issue before the Board was and the issue now before the Court is the likelihood of confusion arising from the concurrent use of plaintiff's and defendant's marks. 15 U.S.C. § 1052(d). In determining whether likelihood of confusion exists, the Court must consider several factors, including (1) the strength of the prior user's mark, (2) the degree of similarity between the two marks, (3) the proximity of the

---

5. The plaintiff contends that the usual "preponderance of the credible evidence" standard, rather than the "thorough conviction" standard should apply to the case at bar. According to plaintiff, unlike *Morgan v. Daniels*, 153 U.S. 120, 124, 14 S.Ct. 772, 773, 38 L.Ed. 657 (1894), a patent case from which the "thorough conviction" standard was derived, in the instant controversy the Board did not have to utilize its special expertise in making its determination. Thus, no extra weight should be given to the Board's findings. The plaintiff further points to the fact that no live testimony was presented to the Board; thus, the Board did not have the opportunity to evaluate the credibility of the witnesses.

Although plaintiff's arguments are appealing, the Second Circuit and most other courts have adhered to the "thorough conviction" standard. Thus, until a contrary direction is given by the Supreme Court or the Second Circuit, this Court declines to modify the prevailing standard of review for actions brought pursuant to 15 U.S.C. § 1071(b). In any event, since the Court finds that ETF has met the higher standard, its request for a lower standard of review is not critical to a resolution of the claim herein.

products, (4) the quality of the subsequent user's product, (5) the likelihood that the prior user will bridge the gap between products, (6) actual confusion, and (7) the sophistication of the buyers.[6] *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1130–31 (2d Cir. 1979) (citing cases); *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). None of these factors is determinative by itself. *McGregor-Doniger, Inc.*, 599 F.2d at 1139. Each factor will be discussed in turn.

### 1. Strength of Nina Ricci's Marks

The "Nina Ricci" mark is a strong distinctive mark which has "secondary meaning". In the eyes of the purchasing public, goods sold under the "Nina Ricci" mark are understood to emanate from a particular source. *See id.* at 1131. The "Nina Ricci" mark is strongest in the field of fragrances. Even though defendant's most popular fragrance is marketed under the name "L'Air du Temps", the Nina Ricci mark is prominently displayed on the products and used in the promotion and advertising of "L'Air du Temps" fragrances. In the field of apparel and accessories, the "Nina Ricci" mark is relatively strong, buttressed in part by its identification with Nina Ricci fragrances.

On the evidence before the Court, defendant's other marks do not appear to be nearly as strong as the "Nina Ricci" mark. While "Capricci" fragrances enjoy modest

sales in the United States, the mark does not have a strong "origin-indicating" quality. *Id.* The "Signoricci" mark is very weak; no products have been marketed under that mark since 1974. At present, the "Mademoiselle Ricci" mark is only slightly stronger; products bearing the "Mademoiselle Ricci" mark have not been sold in the United States since 1979.

Contrary to an express finding made and relied upon by the Board, Nina Ricci does not have a registered trademark "Ricci". The Board's finding that defendant had a "Ricci" mark was clearly erroneous.

### 2. Similarity of the Marks

Importantly, the given name and surname in both the "Nina Ricci" and "Vittorio Ricci" marks always appear together on the parties' respective products. Nina Ricci's products do not bear the mark "Ricci" alone; nor do ETF's products bear the mark "Ricci" alone. Similarly, defendant's weaker marks (i. e., Capricci, Mademoiselle Ricci, Signoricci) do not appear as "Ricci" alone. The occasional editorial references to "Ricci" products are invariably preceded by a reference to either Vittorio Ricci or Nina Ricci. Additionally, the "Nina Ricci" mark is often followed by the words "Paris" or "Paris-New York".

The Second Circuit has instructed that in judging similarity, the court is to consider "all the factors that could reasonably be expected to be perceived and remembered

---

**6.** The Court has intentionally omitted the factor which examines the subsequent user's good faith in adopting the mark—essentially an equitable factor. Nor has the Court included other equitable factors sometimes considered by the courts. *See Vitarroz v. Borden, Inc.*, 644 F.2d 960, 966–67 (2d Cir. 1981). While such equitable factors are properly considered in the context of a trademark infringement suit and the normally concomitant request for equitable (i. e. injunctive) relief, equitable factors are not to be considered by the Board in determining whether to allow registration of a trademark. *See* 15 U.S.C. § 1052(d). Thus, with regard to plaintiff's claim that it is entitled to registration, brought pursuant to 15 U.S.C. § 1071(b), this Court will not consider equitable factors. In the event that the foregoing analysis is found to be erroneous (i. e. the Court *should* consider

equitable factors in the context of a proceeding under 15 U.S.C. § 1071(b)), the Court's determination would remain the same. The Court finds that Vittorio Ricci's and Edward Finkel's choice of the "Vittorio Ricci" mark in late 1974 was made in good faith, without intent to capitalize upon Nina Ricci's marks. While Todd Neil Finkel's change of name to Todd Vittorio Ricci during the pendency of the Board proceeding cannot be ignored, the plaintiff has not urged that its mark be registered because it is the same as Vittorio Ricci's name. Further, in plaintiff's favor, equity cannot disregard the fact that in 1979 (during the pendency of this action) the defendant filed a registration for the trademark "Nina Ricci" covering many goods, including *shoes*, even though it has no intention of marketing shoes in the United States.

by potential purchasers." *Id.* at 1133. Here, the preeminent factor is that the Ricci name is invariably modified by a given name. These are the important factors proven at trial regarding the setting in which the two marks appear, apart from those matters considered below with regard to sophistication of the buyer.

In short, the only demonstrated similarity between plaintiff's and defendant's marks is limited to the surname "Ricci" which always appears with a given name.

### 3. *Proximity of the Products*

■ In assessing product proximity, the Court must consider (1) the nature of the products and (2) the structure of the relevant market(s). *Vitarroz,* 644 F.2d at 967.

Regarding the nature of the products, the Court initially notes that at present there is very little overlap between plaintiff's and defendant's products in the United States. Nina Ricci does not market ETF's primary product—footwear. ETF does not market Nina Ricci's primary product—fragrances. In fact, at present, the only overlap between Nina Ricci and ETF products is in handbags. ETF handbags bearing the "Vittorio Ricci" mark are leather, of fashion forward design, and often complement Vittorio Ricci shoes. No evidence was presented with regard to the Nina Ricci handbags sold in the United States.

As to market structure, Vittorio Ricci handbags are offered for sale at ETF's retail store and at many stores throughout the country. The evidence indicates that, at present, Nina Ricci handbags are only offered at its Bloomingdale's boutique. The parties non-overlapping products are sold in many of the same department stores.

### 4. *Quality of ETF's Products*

ETF products bearing the "Vittorio Ricci" label are, like Nina Ricci's products, high quality, high fashion, expensive products.

### 5. *Bridging the Gap*

At the Nina Ricci store to be opened in Beverly Hills, California, in late 1981 or early 1982, the defendant plans to offer for sale a full line of apparel and accessories, including belts, wallets, purses, and blouses. In the future, Nina Ricci plans to expand its franchising and licensing operations in the United States. However, Nina Ricci has no plans to market shoes in the United States. For its part, ETF plans to expand its leather products area by marketing leather coats, leather jackets, and leather ready-to-wear. ETF has no plans to market fragrances, nor does it seek registration of its mark for such products.

Thus, it appears likely that Nina Ricci will bridge the gap between its products and ETF products to some degree in the future. However, neither party plans to expand into the primary product line of the other.

### 6. *Actual Confusion*

Neither Nina Ricci (nor its agents), ETF, Stefano Ricci's United States agent, nor Luciano Ricci's United States agent have reported confusion between Nina Ricci products and products bearing the "Vittorio Ricci" mark.[7]

### 7. *Sophistication of Buyers*

The evidence presented by several marketing executives (*see McGregor-Doniger,* 599 F.2d at n.7) and Vittorio Ricci himself indicates that the typical purchaser of products bearing the Vittorio Ricci label is quite sophisticated. The customer is generally in a high-income bracket and extremely fashion conscious. Further, given the expensive nature of plaintiff's products, the typical customer is likely to purchase carefully. *Id.* at 1137 ("The greater the value of an article the more careful the typical consumer can be expected to be.").

---

7. The Court ascribes no weight to the market survey conducted at plaintiff's store by Barry Feinberg, a Senior Research Executive for Audits & Surveys, Inc. The plaintiff, through Feinberg, failed to establish the reliability of the survey designed and conducted at plaintiff's request. Parenthetically, the Court draws no adverse inference from defendant's failure to consent to a similar survey being conducted at its Bloomingdale's boutique in New York.

The evidence also indicates that the Nina Ricci customer is relatively sophisticated. *See supra* at 1151–1152. Given the high price of defendant's apparel and accessories, the Court can assume that the Nina Ricci customer will make careful purchases.

Further, because both plaintiff's and defendant's customers are fashion conscious, they are not likely to be misled by two marks which share the same surname but have different first names. Such a similarity in marks is found not infrequently in the fashion industry.

### Conclusion

The Board erroneously found defendant to be the holder of the "Ricci" mark. Further, the Board did not consider the products actually marked by defendant, but instead considered all those products for which it has a registered trademark. In addition, the Board apparently failed to consider the sophistication of the buyers, and it ascribed undue weight to Nina Ricci's successful opposition to other attempted registrations.[8]

■ In light of these perceived deficiencies and weighing all seven factors discussed above, the Court finds with thorough conviction that the Board's determination that plaintiff's trademark, as it applies to shoes and belts, was confusingly similar to defendant's registered marks was erroneous. Accordingly, the Commissioner of Patents is directed to allow registration of plaintiff's "Vittorio Ricci" trademark for shoes and belts. However, given the total absence of evidence regarding neckties, sweaters, and women's blouses, the Court declines to direct the Commissioner of Patents to allow registration of the "Vittorio Ricci" mark for those products.

#### B. *Nina Ricci's Counterclaims*

##### 1. *Trademark Infringement and False Designation of Origin*

■ Regarding a trademark infringement claim brought pursuant to 15 U.S.C.

§ 1114(1) and a claim for false designation of origin brought pursuant to 15 U.S.C. § 1125, the crucial issue to be determined is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *McGregor-Doniger, Inc.,* 599 F.2d at 1130, *quoting Mushroom Makers, Inc. v. R. G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). This issue is essentially identical to the issue of registerability which was previously discussed; the standard for determining the two issues are identical, except for consideration of equitable factors. *See* n.6, *supra.* Since the Court has found that there is no likelihood of confusion between plaintiff's mark and defendant's marks, defendant's counterclaims for trademark infringement and false designation of origin must be dismissed.

##### 2. *Common Law Unfair Competition*

■ To prove unfair competition under New York law, the defendant must demonstrate that ETF has misappropriated Nina Ricci's labor and expenditures. *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir. 1980). Given the absence of likely confusion between plaintiff's and defendant's marks, Nina Ricci has failed to meet its burden. Further, the defendant has failed to demonstrate any bad faith on ETF's part. *See Id.* Accordingly, defendant's counterclaim for unfair competition is dismissed.

##### 3. *Anti-Dilution Law*

■ New York General Business Law § 368–d, known as the Anti-Dilution Law, provides:

"Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of

---

**8.** Each proposed registration must be viewed on its own facts. *Dow Corning Corp.,* 322 F.Supp. at 946. None of the marks which Nina Ricci has successfully opposed in the United States utilized a separate given name in front of the surname "Ricci".

infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

Confusion is not an element of a cause of action under the Anti-Dilution Law. *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 544, 399 N.Y. S.2d 628, 632, 369 N.E.2d 1162 (1977). As explained by the then District Judge Gurfein:

"Dilution is an injury that differs materially from that arising out of the orthodox confusion. Even in the absence of confusion, the potency of a mark may be debilitated by another's use. This is the essence of dilution. Confusion leads to immediate injury, while dilution is an infection which, if allowed to spread, will inevitably destroy the advertising value of the mark."

*Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1296 (S.D.N.Y.1972), *quoted in, Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F.Supp. 366, 377 (S.D.N.Y.1979), *aff'd*, 604 F.2d 200 (2d Cir. 1979).

Given the sophistication of those persons who purchase plaintiff's and defendant's products, the fact that there is no substantial overlap between the parties' products, and the fact that neither product is known as "Ricci" alone but always as "Ricci" with a given name (i. e. either Vittorio Ricci or Nina Ricci), the Court finds that defendant has failed to preponderate on its counterclaim founded on the Anti-Dilution Law. Accordingly, that counterclaim is dismissed.[9]

In sum, the plaintiff's claim for relief is granted in part. The Commissioner of Patents is directed to allow plaintiff's registration of the "Vittorio Ricci" trademark for shoes and belts. Plaintiff's claim with regard to scarves, neckties, and women's blouses is denied without prejudice to its reapplication to the Patent Office. Defendant's counterclaims are dismissed.

**9.** In light of the dismissal of defendant's four counterclaims, the Court need not reach plaintiff's affirmative defenses to defendant's counterclaims (i. e. laches and abandonment).

Plaintiff shall submit judgment on three days' notice.

SO ORDERED.