BENEFICIAL CORPORATION, Beneficial Management Corporation of America, and Beneficial Finance Co. of New York, Inc., Plaintiffs,

v.

BENEFICIAL CAPITAL CORPORATION and Beneficial Capital Management Corporation, Defendants.

No. 80 Civ. 3145(MEL).

United States District Court, S. D. New York.

Jan. 7, 1982.

446

Pennie & Edmonds, Walter G. Marple, Jr., New York City, for plaintiffs; James G. Foley, Pennie & Edmonds, New York City, Douglas C. Russell, Morristown, N. J., of counsel.

Solin & Breindel, P. C., New York City, for defendants.

LASKER, District Judge.

This action was brought by Beneficial Corporation, Beneficial Management Corpo-

ration of America and Beneficial Finance Co. of New York, Inc. ("Beneficial Finance") against Beneficial Capital Corp. ("Capital") and Beneficial Capital Management Corp. ("Capital Management") complaining that defendants' use of the name "Beneficial" is likely to cause confusion as to the source of defendants' services and to induce the public to deal with defendants in the mistaken belief that the services offered by defendants are in fact those of plaintiffs, in contravention of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiffs also claim that defendants' use of the name "Beneficial" creates a likelihood of injury to plaintiffs' business reputation or a dilution of the distinctive quality of plaintiffs' name, under N.Y. General Business Law § 368–d. A bench trial was held.

Beneficial Finance and Capital are both in the business of lending money. Beneficial Finance, a wholly-owned subsidiary of plaintiff Beneficial Corporation, makes consumer and homeowner loans to individuals which average approximately $1,500. per loan. Plaintiffs engage in a substantial amount of advertising: their radio ads, "Toot, toot, at Beneficial, you're good for more," are familiar to a large public. Plaintiff Beneficial Management Corporation of America, also a wholly-owned subsidiary of Beneficial Corporation, owns the registered service mark "Beneficial Finance System" which is used as a service identification in the offices of the subsidiaries of Beneficial Corporation.

Capital is a small business investment company licensed under the Small Business Investment Act of 1958, 15 U.S.C. §§ 681 et seq. ("SBIA") which lends only to small business concerns, as provided by the SBIA.

Since 1976, it has made approximately forty loans. The loans average approximately $54,000., with the smallest to date being for $10,000. It engages in no advertising or marketing; its customers are obtained through referrals. Approximately ninety percent of its loans are to corporations.

Capital Management is a broker dealer registered pursuant to § 15(b) of the Securities Exchange Act of 1934. Its sole business to date has been advising clients on participation in tax shelters and oil and gas partnerships.

## I. *Secondary Meaning*

■ In order to invoke the protection of § 43(a) of the Lanham Act, a user of an unregistered name or mark must demonstrate that its name has acquired "secondary meaning;" *Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299 (2d Cir. 1981), that is, that "the purchasing public has come to associate the [name] . . . with goods from a single source." *RJR Foods, Inc. v. White Rock Corp.* 603 F.2d 1058, 1059 (2d Cir. 1979).[1]

Plaintiffs produced considerable evidence of secondary meaning, including the fact that they have engaged in extensive advertising, focusing on the name Beneficial, and that the subsidiaries using the name Beneficial have entered into consumer loan arrangements amounting to billions of dollars. In addition, plaintiffs introduced a research study, Plaintiffs' Exhibit 12, entitled "A Survey on Company Names," conducted by an experienced market research company, Storm Marketing Research, Inc. The study asked individuals and small businesses randomly selected from the New York, New Jersey and Florida telephone books and con-

---

1. Plaintiffs' argument that they need not prove secondary meaning for the name "Beneficial" because they have registered the mark "Beneficial Finance System" is not persuasive. It is true that where the Patent and Trademark Office decides to register a mark without requiring proof of secondary meaning, the registrant is entitled to a "rebuttable presumption that the mark is more than merely descriptive" and therefore "entitled to protection, regardless of proof of secondary meaning," if confusion of origin is shown. *McGregor-Doniger Inc. v.*

*Drizzle, Inc.,* 599 F.2d 1126 (2d Cir. 1979). However, the term registered by plaintiffs was Beneficial Finance System, not Beneficial, and it cannot be assumed that the name Beneficial, standing alone, would have been found sufficiently distinctive to register. *See Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1042–43 (2d Cir. 1980) (requiring company which had registered the trademark "Saratoga Vichy" to establish the existence of a secondary meaning for the name "Saratoga.")

tacted by telephone whether they had ever heard of a company with "Beneficial" in its name. Those who answered "yes" were then asked, "What kind of business do you think it is in?"[2] Of the eighty-three percent of the respondents who stated that they had heard of a company with "Beneficial" in its name, forty-four percent thought it was in the finance business, and twenty-five percent said the loan business.

Defendants argue that advertising and sales figures are not sufficient proof of secondary meaning and that the research study was seriously flawed because, *inter alia*, it was hurriedly designed and conducted, and limited to respondents in New York, New Jersey and Florida. Moreover, they contend that the fact that numerous other companies also use the name Beneficial demonstrates that it lacks secondary meaning.[3]

█ While advertising and sales figures are not conclusive on the question of secondary meaning, *see McGregor-Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2d Cir. 1979), they are certainly relevant. *RJR Foods, supra*, 603 F.2d at 1060. Advertising is the primary means by which the connection between a name and a company is established in the public mind and sales figures are at least some indication that the advertising may have succeeded.

█ A number of defendants' criticisms of the research study, discussed below, are persuasive. However, on the question of its probative value as to secondary meaning, defendants point out only that the individual who designed the study conceded that it was not designed as a study of secondary meaning. (Trial Transcript, p. 242). Nevertheless, in the absence of any suggestion as to why the persons surveyed are unrepresentative of ordinary consumers or why the questions asked were inappropriate for the purpose of measuring second-

ary meaning, the results of this portion of the study are deemed probative. As for the fact that a number of other companies use the word "Beneficial" in their names, the mere existence of third party users of a name does not contradict a finding of secondary meaning where there is no evidence that the other names have either been promoted or are recognized by consumers. *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976). Moreover, few of the companies listed appear to be in fields related to finance or lending.

Thus, plaintiffs have made a strong showing on the issue of secondary meaning and it therefore becomes necessary to consider the central question: Is " 'an appreciable number of ordinarily prudent purchasers . . . likely to be misled, or indeed simply confused as to the source of the goods [or services] in question?' " *McGregor, supra*, 599 F.2d at 1130, *quoting Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

## II. *Likelihood of Confusion*

The factors relevant to the assessment of the likelihood of confusion are well established:

"Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers."

*Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

---

2. It should be noted that possible answers to the question were not offered by the questioner—the answers were all volunteered by the respondents.

3. In the Joint Pre-Trial Order, it was stipulated that forty-two companies which used the word

"Beneficial" in their names had been identified, including two whose names may suggest the finance field: Beneficial Acceptance Corp. and Beneficial Investment Corp. (Stipulated Facts ¶ 6).

#### (1) *The Strength of the Mark*

The strength of a name is to be judged by "its tendency to identify the goods [or services] sold under [that name] . . . as emanating from a particular . . . source." *McGregor, supra,* 599 F.2d at 1131. The discussion above of plaintiffs' advertising, sales and name-recognition is equally applicable to the question of the strength of the name. Plaintiffs have demonstrated that the name Beneficial, as used by them, is strong.

#### (2) *The Degree of Similarity Between the Two Names*

■ Little needs to be said with respect to this factor, except to note that the words in defendants' names other than Beneficial, that is, "Capital" and "Management," do not substantially distinguish defendants' business from that of Beneficial Finance.

#### (3) *The Proximity of the Products* *The Sophistication of the Buyers*

■ Plaintiffs are not required to prove that their services are identical to those offered by defendants, but they must show that the services are "sufficiently related that customers are likely to confuse the source of origin." *Scarves by Vera, supra,* 544 F.2d at 1173.[4]

The question of the proximity of the products is considered in connection with the question of the sophistication of the buyers because of the closeness of two products is, at least in part, a function of the extent to which purchasers can and do examine and distinguish them.

Plaintiffs argue that the public does not distinguish between small consumer loans of the type made by plaintiffs and medium-sized business loans of the type made by defendant. However, we do not find that the plaintiffs have proven this to be so.

First, plaintiffs and defendant serve entirely different markets. Plaintiffs make only consumer loans; defendant's loans may be used for business purposes only, as provided by the SBIA. Plaintiffs' loans are made only to individuals; defendant has made only a few loans to individuals, and those were solely for the purpose of acquiring working capital. Moreover, the differences in average amounts loaned—plaintiffs' loans average $1,500., defendant's $54,000.—is significant evidence of the difference in their respective markets. In addition, plaintiffs and defendant engage in entirely different marketing approaches. Plaintiffs advertise heavily in all of the major media. By contrast, defendant does no advertising or marketing of any kind, relying entirely on referrals. As Judge Weinfeld stated in a recent trademark case, the services offered by the parties "appeal to different customers, are sold in entirely different markets, exist for distinct purposes, and thus, are in no sense proximate products." *Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147 (S.D. N.Y.1980).

■ All of the evidence introduced as to the sophistication of the customers of defendant supports this conclusion.[5] Three of defendant's customers testified at trial, and they clearly qualified as "sophisticated purchasers" by virtue of their substantial business experience and advanced academic de-

---

**4.** It should be noted that the business of Beneficial Capital Management Corp., a broker dealer which has engaged, to date, only in advice to clients on participation in oil and gas ventures and tax shelters, is entirely unrelated to the business of plaintiffs. No evidence to the contrary has been presented. Therefore, there is no possibility of confusion between plaintiffs and Capital Management. Accordingly, the remainder of the opinion focuses on defendant Capital.

**5.** Ordinarily, it would also be useful to consider the sophistication of *plaintiffs'* customers be-

cause of the danger that plaintiffs' customers might become confused by the similarity of the names and utilize defendant's services when intending to use plaintiffs', a problem referred to as "diversion of purchasers." *McGregor, supra,* 599 F.2d at 1134. However, diversion is not an issue in this case, because, in view of the very limited scope of defendant's business (forty loans in the past six years; no advertising) there can be no genuine concern that any noticeable amount of plaintiffs' business will be "diverted" to defendant because of the similarity of the names.

grees.[6] Moreover, the fact that over twenty-five percent of defendant's clients employ more than twenty people is further evidence of their sophistication. Furthermore, defendant argues reasonably that we may infer at least a moderate amount of sophistication from the fact that its clients are in a position to borrow a minimum of $10,000. The fact that the use of a particular service entails both substantial funds and a "fairly detailed purchasing process" is recognized as being a significant index of buyer sophistication. *McGregor, supra,* 599 F.2d at 1138, *citing Blue Bell, Inc. v. Jaymar-Ruby, Inc.,* 497 F.2d 433, 435-36 & n.5 (2d Cir. 1974).

■ The plaintiffs may or may not be correct in arguing that the general public does not distinguish between different kinds of loan companies. However, the trademark laws do not protect against the possibility that a member of the general public might fall under the mistaken impression that the companies are related. Rather, the trademark laws are intended to protect those members of the public who are or may become customers of either from purchasing the products of one of them under the mistaken assumption that they are buying a product produced or sponsored by the other. *See Scarves by Vera, supra,* at 1172. In view of the pronounced differences between the loans made by plaintiffs and those made by defendant, and the convincing evidence of the sophistication of defendant's customers, we conclude that the possibility of the confusion against which the trademark laws protect must be characterized as remote.

#### (4) *The Likelihood That the Prior Owner Will Bridge the Gap*

"The concept of 'bridging the gap' considers the senior user's interest in preserving reasonable avenues of future expansion into related fields. However, there is a countervailing public interest in not providing an overly broad ambit of

protection that would enable the senior user to preclude others from entering unrelated markets into which it has no intention of entering."

*Information Clearing House, supra,* 492 F.Supp. at 159.

■ Plaintiffs introduced evidence that they have recently established a subsidiary, Beneficial Business Credit Corp. ("BBCC") which loans money to small businesses. However, BBCC cannot be considered a real competitor of defendant's as it does not make SBIA loans, which have the advantage, among other factors, of making credit more easily available because they are government insured, and it makes few loans (six percent of its total) in the states in which defendant operates. The plaintiff has not proven that the possibility of future competition will be substantial, particularly in view of the lack of evidence that plaintiffs intend to expand BBCC either into the SBIA market or geographically. Accordingly, we conclude that plaintiff has failed to establish that there is a real possibility that it will bridge the gap between its services and those offered by defendant.

#### (5) *Actual Confusion*

■ The sole evidence of actual confusion between plaintiffs and defendant, such as it is, is to be found in the market research survey commissioned by plaintiffs, discussed above. To the key question asked by the survey, "Do you think that there may or may not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?" thirty-one percent of the respondents stated that such a connection was either definite or probable. This evidence is of little probative value, however. First: the question framed has a "leading" quality, not well suited to eliciting an uninfluenced reaction from the persons questioned. Second: while thirty-one percent of those questioned may have indicated confusion, sixty-nine percent apparently did not. Finally, the

---

**6.** A fourth customer testified briefly, but no questions were directed to the issue of her

sophistication.

survey, in which random consumers and small businesses were selected from the telephone book, cannot be credited as a survey of "consumer reaction to the products under actual market conditions." *Information Clearing House, supra,* 492 F.Supp. at 160, because when faced with the prospect of borrowing money from either plaintiffs or defendant, a consumer or business would necessarily know more about the company than the minimal information provided to the survey respondents: the names of the companies. The survey establishes no more than that the names are similar, a factor as to which there can be little genuine dispute in any event, and that portions of the general public will make the reasonable assumption, that, in the absence of any other information, two companies with similar names are likely to have a business connection. However, this proposition provides no indication of public reaction under actual market conditions, and we conclude that there is no meaningful evidence of actual confusion. "While a plaintiff need not prove actual confusion in order to prevail . . . 'it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion.'" *McGregor, supra,* 599 F.2d at 1136, *quoting Affiliated Hospital Products, Inc. v. Merdel Game Mfg. Co.,* 513 F.2d 1183, 1188 (2d Cir. 1975) (other citations omitted).

### (6) *Good Faith*

Both of the founders of defendant testified that they had heard of plaintiff at the time they adopted the name Beneficial, but perceived no connection between plaintiffs' loan business and their own.

While little can be said in favor of the selection of a name in which a company in a related area has made a substantial investment, plaintiffs have not established that the name was chosen in order to trade on plaintiffs' reputation.

### (7) *The Quality of the Product*

■ Although no evidence was specifically directed to the issue of the quality of defendant's services, defendant's president testified that seventy-five percent of the defendant's 1980 loans were made to existing customers. The fact that a substantial portion of defendant's business is from repeat customers is at least some indication that its customers are satisfied with its services: i.e., that it furnished a product of reputable quality.

### *Conclusion*

Although plaintiffs have established that they have a distinctive name and that defendant's name is similar, their case founders on the broad gap between their services and the services offered by defendant. In addition, our finding that defendant's customers are relatively sophisticated purchasers further weakens plaintiffs' claim that the public may be induced into dealing with the defendant in the mistaken belief that the services offered by defendant are those of, or sponsored by, plaintiffs. Moreover, the lack of persuasive evidence of plaintiffs' intent to bridge the gap, of actual confusion, of defendant's bad faith, or of the quality of defendant's services undermine plaintiffs' case. For these reasons, we find and conclude that plaintiffs have failed to sustain their burden of proving that "an appreciable number of ordinarily prudent purchasers are likely to be misled . . . as to the source of the goods [or services] in question." *McGregor, supra,* 599 F.2d at 1130.

### III. *New York's Anti-Dilution Statute*

[14] Plaintiffs have failed to establish a right to relief under New York's anti-dilution statute, N.Y. General Business Law § 368–d, because the statute requires a finding either of likelihood of confusion or bad faith, neither of which has been proven here.

> "Although the language of the statute appears to dispose of the necessity of establishing confusion, the cases require that either a likelihood of confusion be found, or a finding that the defendant intentionally selected the name with the intent to trade upon the reputation of the prior user."

*Sears, Roebuck and Co. v. Allstate Driving School, Inc.* 301 F.Supp. 4, 19 (E.D.N.Y. 1969). *See also Laverne International, Ltd. v. American Institute,* 353 F.Supp. 659, 666 (S.D.N.Y.1973) ("the decisions of the New York courts in cases involving the anti-dilution statute have depended upon some confusion, fraud, deception or palming-off").

### IV. *Defendant's Counterclaim for Cancellation of Plaintiff's Registered Service Mark*

■ Defendants have counterclaimed for the cancellation of plaintiffs' registered service mark, "Beneficial Finance System," on the grounds that: (1) plaintiffs had not been the exclusive user of the mark for the five years preceding registration, as required by § 2(f) of the Lanham Act, 15 U.S.C. § 1052; and (2) since registering the mark, plaintiffs have abandoned it by allowing others to use it. In support of their counterclaim, defendants have shown that other companies have used the word "Beneficial" in their names, both within the five years prior to plaintiffs' registration of the mark and since that time. However, there is no evidence that anyone other than plaintiffs has ever used the mark "Beneficial Finance System," although many companies have used the word "Beneficial." With reference to secondary meaning, we concluded, above, that the word "Beneficial," standing alone, is not identical to the three-word symbol "Beneficial Finance System." The same conclusion applies here and is dispositive: since there is no evidence that any other company has used plaintiffs' mark, there is no support for defendants' counterclaim for the cancellation of the mark.

*   *   *   *   *   *

Accordingly, judgment may be entered in favor of defendants on all claims; and on the counterclaims, in favor of plaintiffs.

Submit judgment.